UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

                    Plaintiff,                    Court File No. 18-cr-18 (1) (DWF/LIB)

        v.
                                                  **REPORT AND RECOMMENDATION**

Andre Mathis, Jr.,

                    Defendant.


        This matter is before the undersigned United States Magistrate Judge pursuant to a

general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule

72.1, and upon Defendant Mathis' Motion to Suppress Evidence Obtained as a Result of

Searches and Seizures, [Docket No. 43]; his Motion to Sever Defendant, [Docket No. 55]; his

Motion to Strike Surplusage, [Docket No. 56]; his Supplemental Motion to Suppress Search and

Seizure, [Docket No. 57], and his Motion to Suppress Statements, [Docket No. 58]. The Court

held a Motion Hearing on May 7, 2018, at which the parties requested the opportunity to submit

supplemental briefing on the aforementioned Motions. [Docket No. 65]. The supplemental

briefing was completed on June 20, 2018, after which Defendant Mathis' Motion to Suppress

Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43]; his Motion to Sever

Defendant, [Docket No. 55]; his Motion to Strike Surplusage, [Docket No. 56]; his Supplemental

Motion to Suppress Search and Seizure, [Docket No. 57], and his Motion to Suppress

Statements, [Docket No. 58], were taken under advisement.

        For the reasons set forth below, the Court recommends that Defendant Mathis' Motion to

Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], be

1

**DENIED**; his Motion to Sever Defendant, [Docket No. 55], be **DENIED without prejudice**; his Motion to Strike Surplusage, [Docket No. 56], be **DENIED without prejudice**; his Supplemental Motion to Suppress Search and Seizure, [Docket No. 57], be **DENIED;** and his Motion to Suppress Statements, [Docket No. 58], be **DENIED**.

## I.     RELEVANT FACTS

Defendant Andre Mathis, Jr., has been criminally charged with one count of conspiracy to commit sex trafficking of a minor; one count of sex trafficking by force, fraud, and coercion; and one count of sex trafficking of a minor. (Indictment, [Docket No. 19]). The Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43]; the Supplemental Motion to Suppress Search and Seizure, [Docket No. 57]; and the Motion to Suppress Statements, [Docket No. 58], pertain to events that took place during law enforcement's investigation of the crimes with which Defendant Mathis has been charged. Because resolutions of the present Motions requires a detailed consideration of the facts related to each encounter between Defendant and law enforcement and the facts related to each search warrant now challenged, a general overview of the underlying facts is provided at the outset of this Report and Recommendation, and additional facts are recited as needed in the analysis sections below.

On July 7, 2017, Duluth Police were asked to assist a probation officer with a check of a GPS unit being used by an individual, Andreia Latrice Brown, who was on probation. ([Docket No. 62-10], 2; see, also, Govt. Exh. 14, C_D-file2(2).mp4, 00:00-2:21[1]). Ms. Brown was present in her apartment when the officers arrived, and she let them into the apartment; also present in

---

[1] The name of the audio/video recording cited here, as labeled by the Government in its Exhibit 14, includes the full name of one of the minors, elsewhere referred to as CLD, who is an alleged victim of the crimes charges in this case. Rather than include the victim's name in this publically filed Report and Recommendation, the Undersigned will refer to this video file as "C-D-file 2(2) mp4".

the apartment was Defendant Mathis. (Id. at 2:00-21, 2:30-47; 4:06-55). While in Ms. Brown's apartment, the police officers discovered a young woman in a closet; ultimately, the young woman was discovered to be a minor runaway, and she left with the police officers. (Id. at 3:30-40, 32:33-39:18).

Duluth Police Officer Pemrick interviewed the minor, "CLD," at Duluth Police Headquarters, and she stated that she had run away from the Solway House in Duluth on June 17, 2017, and that she had met Defendant Mathis and begun staying at Ms. Brown's apartment the same day. (Govt. Exh. 1, [Docket No. 62-1], 2; Govt. Exh. 2, [Docket No. 62-2], 2). CLD also informed Duluth police that she had sex with Defendant Mathis daily, the most recent being that very morning. (Govt. Exh. 1, [Docket No. 62-1], 2). In addition, CLD stated that Defendant Mathis had used cell phones—both text messages and voice calls—to arrange for her to have sex with individuals in exchange for money. (Id.). Defendant Mathis allowed CLD to send text messages to her parents, but he reviewed the text messages before she could send them. (Id. at 2-3). CLD also told police that Defendant Mathis possessed a pink taser that he used to intimidate and threaten her; he had "spark[ed]" the taser and hit her with it. (Id. at 3).

CLD stated that Defendant Mathis had trafficked her on four occasions to a man named "Amos." (Id. at 2). She further explained that Defendant Mathis gave her a "code word" to use if Amos wanted anything other than the services already agreed upon, and Defendant Mathis sat in Amos' living room while CLD had sex with Amos so that he could hear the code word if she used it. (Id. at 2). CLD also told Officer Pemrick that "Amos" took pictures of her with his phone. (Id.). CLD described the apartment of the man named "Amos" and Officer Pemrick, who was familiar with Amos Kiprop Koech (Defendant Koech) through his patrols in Defendant

Koech's neighborhood, believed that the man CLD referred to as "Amos" was Defendant Koech. (Id.).

Based upon CLD's statements, Robert Shene of the Duluth Police Department applied for and, in the early hours of the morning of July 8, 2017, obtained a warrant to search Ms. Brown's apartment for items CLD had said were in the apartment, and to collect a buccal swab and a penile swab from Defendant Mathis. (Id. at 1-8). The swabs were collected, Ms. Brown's apartment was searched, and various items were seized by police.

During her July 7, 2017, interview, CLD also informed Officer Pemrick that Defendant Mathis had also "'sold'" her friend, MLF, also a juvenile, to a male named "Sneak," who was missing his left ear. (Govt. Exh. 2, [Docket No. 62-2], 2). Duluth Police subsequently found MLF in the company of an individual who was identified as "Sneak," but MLF denied being sexually trafficked. (Id. at 3).

Investigator Christopher Martin of the Duluth Police Department interviewed MLF on August 1, 2017. (Govt. Exh. 2, [Docket No. 62-3], 9). MLF stated that she had maintained contact with CLD through her Facebook account. (Govt. Exh. 3, [Docket No. 62-3], 9). Investigator Martin thereafter located Facebook accounts for CLD under her name and for Defendant Mathis under the name "Nope Goodie." (Id.).

On August 7, 2017, Investigator Martin applied for and obtained a warrant to forensically search certain cell phones which had been seized pursuant to the July 8, 2017, search warrant referenced above. (Govt. Exh. 2, [Docket No. 62-2]). In addition, on August 22, 2017, Investigator Martin applied for and obtained a warrant to retrieve certain information from Facebook regarding the account under the name "Nope Goodie." (Govt. Exh. 3, [Docket No. 63-3]).

Thereafter, Duluth Police learned through an interview with CLD that she had been communicating with a Facebook user under the name of "Yf Mir" who had helped CLD run away from Sol House in June 2017. (Govt. Exh. 4, [Docket No. 62-4], 6). Through investigation, Investigator Martin came to believe that the "Yf Mir" account belonged to an individual who died in early October 2017, and whom Investigator Martin believed had been at Ms. Brown's apartment shortly before the police arrived on July 7, 2017. (Id.). By reviewing the information obtained through the August 22, 2017, Facebook warrant for the "Nope Goodie" account, Investigator Martin believed that Defendant Mathis might be located in Rock Island, Illinois, or Davenport, Iowa. (Id.). Accordingly, on October 19, 2017, Investigator Martin applied for and obtained another warrant for information from Facebook, including more information about the "Nope Goodie" account and information about the "Yf Mir" account. (Id. at 1-10).

The information gleaned through the various Facebook warrants led law enforcement to believe that Defendant Mathis had left Duluth shortly after CLD was found in and removed from Ms. Brown's apartment. (Govt. Exh. 5, [Docket No. 62-5], 13). Defendant Mathis had been convicted and placed on probation on an unrelated Minnesota State criminal conviction, and he absconded from that probation on July 12, 2017. (Id.). Law enforcement believed he was actively evading them. (Id. at 14).

On January 23, 2018, Defendant Mathis was indicted in the United States District Court for the District of Minnesota, on the charges currently pending. [Docket No. 1]. At the time, his whereabouts were unknown. (Govt. Exh. 5, [Docket No. 62-5], 14).

On March 11, 2018, Defendant Mathis was arrested in Rock Island, Illinois. (Id.). During his arrest, two cellular telephones were seized. (Id.). Special Agent Craig J. Heidenreich of the

Federal Bureau of Investigation applied for and obtained warrants to forensically examine the cell phones. (Govt. Exhs. 5 and 6, [Docket Nos. 62-5 and 62-6]).

Defendant Mathis' present Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43]; his Supplemental Motion to Suppress Search and Seizure, [Docket No. 57]; and his Motion to Suppress Statements, [Docket No. 58], challenge the search warrants detailed above, as well as, statements Defendant Mathis made during the July 7, 2017, police presence at Ms. Brown's apartment, and his arrest in Rock Island, Illinois.

## II.    DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCHES AND SEIZURES, [DOCKET NO. 43]

In his Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], Defendant limits his challenges to six search warrants, one each issued on July 8, 2017; August 7, 2017; August 22, 2017; and October 19, 2017, and two which were issued on April 18, 2018. [Docket No. 43].

### A.  Standards of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV.

> "[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." . . . [W]hether the expectation is reasonable is a question of law.

(Internal citations omitted.) United States v. Maxwell, 778 F.3d 719, 732 (8th Cir. 2015).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence

of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted). In addition, "[t]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (edits in Wiley).

In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the issuing

court] had a 'substantial basis for . . . [concluding]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B. Analysis**

**i.  July 8, 2017, Search Warrant (Govt.'s Exh. 1, [Docket No. 62-1])**

On July 8, 2017, Robert Shene of the Duluth Police Department applied for and obtained a search warrant to (1) search Defendant's person in order to take a buccal swab and a penile swab and (2) search Ms. Brown's apartment for "[f]our cell phones including a Samsung Galaxy S7," one pink taser; girls' clothing, including undergarments; and photographs of the interior of the apartment. (Govt. Exh. 1, [Docket No. 62-1]). The application for the July 8, 2017, search warrant stated the following facts as the grounds for issuing the search warrant:

1. Juvenile female CLD [birth date] was listed as a runaway from Solway House, 2405 W. 5th St., Duluth, MN on 6/17/2017.

2. CLD was located in a closet at [address] on the evening of 07/07/2017.

3. That apartment is rented by Andreia Latrice BROWN [birthdate].

4. Andre MATHIS [birthdate] was also in Apartment [redacted] with BROWN and CLD.

5. CLD was removed from the apartment and interviewed at the Duluth Police Department.

6. CLD told police the following information:
   a. She met MATHIS the same day she ran from the Solway House.
   b. She has been staying at BROWN's apartment [redacted] since she met MATHIS. CLD has several pieces of clothing in the apartment including under garments [*sic*].
   c. She has had sex including penile/vaginal intercourse with MATHIS daily, the latest being the morning of 07/07/2017.
   d. She has been trafficked by MATHIS a total of four times with one client named Amos
   e. The agreed upon price was $150 for penile/vaginal intercourse.
   f. On two of those occasions, client Amos only had $100 and that was accepted.

g. CLD was given a code word to use if client Amos wanted anything else so the price could be adjusted.

h. MATHIS was in the living room of Amos' residence each time to be able to hear the code word if needed.

i. MATHIS uses cell phones to arrange client's [*sic*] for CLD, including voice calls and text messages.

j. MATHIS allowed CLD to use a Samsung Galaxy S7 to send text messages to her parents.

k. MATHIS reviewed the text messages before CLD sent them to make sure they did not raise alarm.

l. MATHIS has a pink taser that he uses to intimidate and threaten CLD. He will "spark" the taser and/or hit her with it.

m. At the time CLD was located on 07/07/2017, MATHIS told CLD to use the name [redacted].

n. CLD did use that name with police when she was located.

o. Police have been outside BROWN's apartment since seeing MATHIS there. No one has left the residence.

(Id. at 2-3).

Defendant Mathis contends that the affidavit in support of the application for the July 8, 2017, warrant is insufficient for two reasons: first, because there is no corroboration of CLD's statements, and second, because the affidavit "made no effect [*sic*] to discern whether the three other phones were ever used in the course of the alleged criminal conduct." (Mem. in Supp., [Docket No. 73], 7-8). In response, the Government contends that the lack of independent corroboration of CLD's statements is not fatal to the search warrant. (Mem. in Opp., [Docket No. 79], 11-12). The Government does not respond to Defendant Mathis' argument regarding the nexus between the phones and alleged criminal conduct.

First, to the extent that Defendant Mathis is attempting to challenge the sufficiency of the warrant to search Ms. Brown's apartment, he lacks standing to do so. In order to have standing to seek suppression of the fruits of an allegedly unconstitutional search of Ms. Brown's apartment, Defendant Mathis must "prov[e] a reasonable expectation of privacy in the area searched." See, U.S. v. Maxwell, 778 F.3d 719, 732 (8th Cir. 2015). Defendant Mathis bears the burden to make

this showing, and he may not "rely on 'positions the government has taken in the case' but must 'present evidence of his standing, or at least . . . point to specific evidence in the record which the government presented [that] established his standing.'" See, Id. (citation omitted). Defendant has made no such argument, and in fact he told officers at Ms. Brown's apartment shortly after CLD was discovered therein that he was Ms. Brown's friend, and not a roommate. (Govt. Exh. 14, C_D-file 2(2).mp4, 4:00-30). "A casual visitor does not have an expectation of privacy[.]" U.S. v. Heying, No. 14-cr-30 (JRT/SER), 2014 WL 5461988, *17 (D. Minn. Aug. 15, 2014) (citing U.S. v. Perez, 700 F.2d 1232, 1236 (8th Cir. 1983)). On the record before the Court, it does not appear that Defendant Mathis has standing to challenge the search warrant for the search of Ms. Brown's home. See, United States v. Davis, 361 Fed. Appx. 704, 705-06 (8th Cir. 2010) (unpublished opinion) (holding that defendant lacked standing to challenge the search warrant authorizing the search of his uncle's home when "[t]he evidence did not show that [he] either lived or stayed more than irregularly at his uncle's residence, that he stored personal effects there which he admitted to owning, or that he had exclusive access to or had taken precautions to maintain privacy in . . . the room where the [evidence] was found").

In any event, Defendant Mathis' standing to challenge the July 8, 2017, search warrant as it pertained to the search of Ms. Brown's apartment is irrelevant because the search warrant, in its entirety, was supported by sufficient probable cause. As already set forth above, "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." See, Mutschelknaus, 592 F.3d at 828.

First, to the extent that Defendant Mathis argues that CLD's statements were insufficient to support probable cause without independent corroboration, that argument fails. Defendant

Mathis essentially challenges the reliability of CLD as the sole informant behind the most crucial facts asserted in the affidavit submitted in support of the July 8, 2017, search warrant application. See, U.S. v. Malek, No. CR.14-40125-01-KES, 2015 WL 5494183, *7 (D. S.D. Sept. 14, 2015) ("When search warrant affidavits are based upon information supplied by informants, the key question is whether such information is reliable.").

Although corroboration is, as Defendant Mathis argues, one route by which an informant's reliability and credibility can be established, it is not the only route. "'[T]here is an inherent indicia of reliability in the richness and detail of first hand observation' by an officer of an informant and the ability of police to question the informant face-to-face gives greater weight to the officer's decision to rely on the informant's first-hand observations." Malek, 2015 WL 5494183, at *8 (quoting U.S. v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994)). In the present case, CLD met with Duluth police officers who could gauge her reliability and credibility through the face-to-face interactions. In addition, CLD gave first-hand information, which lends her further credibility, as the information came from her own observations and experiences, rather than hearsay. See, U.S. v. Braden, 844 F.3d 794, 799 (8th Cir. 2016) ("The informant's basis of knowledge was particularly strong that officers would find [contraband] in the home because the informant lived in the home and observed [the defendant] with [the contraband]."). Thus, CLD was a reliable informant with respect to the information she provided Duluth police as related in the affidavit submitted in support of the July 8, 2017, search warrant application.

The affidavit submitted in support of the application for the July 8, 2017, search warrant set forth that CLD was a minor and that CLD stated: (1) she had been staying in Ms. Brown's apartment for almost 3 weeks; (2) Defendant Mathis had sex with her every day, including that morning; (3) she had left undergarments at Ms. Brown's apartment; (4) Defendant Mathis

11

allowed her to message her parents on a Samsung Galaxy S7 phone, but he approved all messages before they were sent; (5) Defendant Mathis hit her and threatened her with a taser; (6) Defendant Mathis took money in exchange for arranging for other men to have sex with CLD; and (7) that Defendant Mathis arranged this trafficking by cell phone.

These detailed allegations by CLD that, under the totality of the circumstances, established a fair probability that evidence of sex crimes involving a minor victim—including cell phones used to traffic CLD, CLD's undergarments, and a pink taser—would be found in Ms. Brown's apartment. Similarly, the allegations by CLD that she had engaged in vaginal intercourse with Defendant Mathis that morning established a fair probability that evidence of a sex crime involving a minor victim would be found by taking buccal and penile swabs from Defendant Mathis' person. Accordingly, under the totality of the circumstances presented here, the affidavit submitted in support of the application for the July 8, 2017, search warrant contained sufficient information to support a finding of probable cause to issue the search warrant.

To the extent that Defendant Mathis seeks to suppress the items seized pursuant to the July 8, 2017, search warrant described above, the Undersigned recommends that Defendant Mathis' Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], be denied.

### ii. August 7, 2017, Search Warrant (Govt.'s Exh. 2, [Docket No. 62-2])

On August 7, 2017, Investigator Martin applied for and obtained a search warrant for six identified cell phones. (Govt. Exh. 2, [Docket No. 62-2]). In support of the August 7, 2017, application for a search warrant, Investigator Martin submitted an affidavit that included, in part, the information set forth in the July 8, 2017, search warrant application. (Id. at 2). Specifically,

the affidavit in support of the August 7, 2017, search warrant application reiterated that CLD had been found in Ms. Brown's apartment and that CLD had later told police that she had used a Samsung Galaxy S7 that was in Ms. Brown's apartment; that Defendant Mathis was trafficking her; that Defendant Mathis "had 3 or 4 phones that he uses to communicate with 'clients.'" (Id.). Moreover, the affidavit stated that during the subsequent search of Ms. Brown's apartment, pursuant to a search warrant, 6 cell phones were seized, and Defendant "Mathis claimed none of the cell phones were his." (Id. at 3).

In addition, the affidavit in support of the August 7, 2017, search warrant application set forth Investigator Martin's experience investigating sex trafficking and juvenile crimes, in addition to his attendance at seminars on human trafficking. (Id. at 2). The affidavit further disclosed:

> [Investigator Martin] through his training and experience knows that sex traffickers will often use cell phones to arrange clients, and post ads online regarding sexual services. [Investigator Martin] knows that cell phones can hold numerous items of evidentiary value to a criminal case including: contact lists, text messages, phone logs, internet web histories, emails, and other social media items.

(Id. at 3-4).

With respect to the August 7, 2017, search warrant, Defendant Mathis argues only that "the text does not disclose a probable cause basis to search any particular phone." (Mem. in Supp., [Docket No. 73], 8). The Government does not respond directly to this argument; instead, the Government sets forth the contents of the affidavits submitted in support of the various search warrant applications in this case, and it argues generally that "there can be no dispute that substantial evidence existed to support the finding of probable cause to issue the search warrant[s] for defendant's person, phones, and Facebook accounts to look for evidence of crimes

involving sex trafficking and possible obstruction of such an investigation." (Mem. in Opp., [Docket No. 79], 13).

Again, it is unclear whether Defendant Mathis even has standing to challenge the search of the six cell phones at issue in the August 7, 2017, search warrant. The affidavit submitted in support of the search warrant application states that Defendant Mathis claimed that none of the cell phones were his. In his current written submissions to the Court, Defendant Mathis states, without citation to any legal authority: "While Mr. Mathis, the affidavit avers, 'claimed none of the phones were his,' if the Government is taking the counter position, i.e., that one of more of the six phones were indeed the ones he owned, then he has standing." (Mem. in Supp., [Docket No. 73], 8). Simply put, this is not an accurate representation of the applicable law. As set forth above, in order to establish standing to challenge a search executed pursuant to a warrant, Defendant Mathis must "prov[e] a reasonable expectation of privacy in the area searched"—in this case, the six cell phones. See, Maxwell, 778 F.3d  at 732. Moreover, the Eighth Circuit has explicitly instructed that a defendant attempting to make this showing may not "rely on 'positions the government has taken in the case' but must 'present evidence of his standing, or at least . . . point to specific evidence in the record which the government presented [that] established his standing.'" See, Id. (citation omitted). Defendant Mathis' only asserted basis for standing to challenge the August 7, 2017, search warrant is the Government's position, and that is not enough to support standing.

In any event, once again, the issue of Defendant Mathis' standing is ultimately irrelevant, as the affidavit submitted in support of the August 7, 2017, search warrant is sufficient to establish probable cause that the cell phones contained evidence of a crime. They were seized from an apartment at which a minor victim of sex trafficking had been recovered; her accused

14

trafficker was also at the apartment; and the victim informed police that her trafficker had used cell phones to traffic her. Moreover, the affidavit set forth Investigator Martin's professional experience and knowledge that supported the belief that sex traffickers often use cell phones to contact clients and arrange trafficking. Thus, it was reasonable for the issuing judge to conclude that there was a fair probability that evidence of that criminal activity would be found in those six cell phones; that is, there was probable cause to support the August 7, 2017, search warrant.

To the extent that Defendant Mathis seeks to suppress the items seized pursuant to the August 7, 2017, search warrant described above, the Undersigned recommends that Defendant Mathis' Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], be denied.

### iii. August 22, 2017, Search Warrant (Govt.'s Exh. 3, [Docket No. 62-3])

On August 22, 2017, Investigator Martin applied for and obtained a warrant to obtain information from Facebook, Inc. with respect to the Facebook account for user name "Nope Goodie," which Defendant Mathis concedes is his account. (Govt. Exh. 3, [Docket No. 62-3]; see, also, Mem. in Supp., [Docket No. 73], 8).

Defendant Mathis appears to argue that there is insufficient probable cause to support the issuance of this search warrant; he points out that the affidavit submitted in support of the August 22, 2017, search warrant "doesn't say a crime has been committed using social media . . . ." (Id. at 9). In response, the Government contends that the affidavit "set forth particular facts about the sex trafficking investigation and use of Facebook by [CLD] and [Defendant] Mathis" and asserts generally that a finding of probable cause was supported by "substantial evidence." (Mem. in Opp., [Docket No. 79], 10, 13).

The affidavit submitted in support of the application for the August 22, 2017, search warrant included a recitation of Investigator Martin's professional experience, as well as general information about Facebook as a structure, the uses of Facebook, how individuals can correspond through the Facebook platform, and how information gathered and retained by Facebook can provide insight into a Facebook user's location, time spent on Facebook, sources of payment utilized, contacts, and photographs. (Govt. Exh. 3, [Docket No. 62-3], 7-8). The affidavit stated the following specific facts related to the present case:

3.[2] On 6/17/2017 [MLF, birthdate redacted], hereinafter referred to as [MLF], was listed as a runaway from the SOL house. . . . Another juvenile ran away with [MLF], identified as [CLD, birthdate redacted], hereinafter referred to as [CLD].

4. On 7/7/2017 [CLD] was recovered under ICR 17150498. [CLD] reported that during the time she was listed as a runaway being sexually trafficked, and having sex with a male later identified as Andre Mathis [birthdate redacted], hereinafter referred to as Mathis. [CLD] reported being sexually trafficked by Mathis to a male named "[A]mos." [CLD] stated that she had been beaten, and tased throughout the time she was with Mathis. Search warrants were executed and numerous phones were seized, as well as a pink taser. [CLD] was recovered at [Ms. Brown's address].

5. Mathis was inside the apartment with [CLD] when she was recovered. [CLD] was found originally hiding in a closet and was later interviewed by Officer Pemrick. [MLF] was recovered in Superior, Wisconsin and interviewed by [Investigator Martin] on 08/01/2017. [MLF] denied being sex trafficked but did state that Mathis had tried to sell her and [CLD] for sex, and she got away from Mathis.

6. [MLF] did state that she was able to maintain contact with [CLD] through her facebook account. As of this date on 8/22/2017 [CLD] is listed as a missing person in NCIC. Your affiant was able to preserve the accounts of [CLD] and Mathis. [CLD]'s account is listed under her name and your affiant was able to locate Mathis' account under Nope Goodie. Your affiant was able to identify [M]athis through photos on his facebook page of Nope Goodie, as Mathis.

7. Your affiant knows through training and experience that traffickers and trafficking victims will use social media as a means to communicate. Your affiant also saw messages from [MLF's] facebook account warrant download that [CLD] was looking to find "dre." Your affiant suspects [CLD] is attempting to locate

_____

[2] The numbered list of facts begins with the number 3.

16

Mathis and asks the court to grant a search warrant to help with the investigation of [CLD] as a missing person and also to investigate the allegations of sex trafficking.

8. Your affiant also noted that as of this date of 08/22/2017 Mathis has current arrest warrants out for violations of probation in St. Louis County.

(Govt. Exh. 3, [Docket No. 62-3], 9).

Although the affidavit submitted in support of the August 22, 2017, warrant application is not a model of completeness, the Undersigned nevertheless concludes that when the totality of the circumstances in the present case are considered and all reasonable inferences of fact are drawn therefrom, the affidavit was sufficient to provide the issuing judge with a reasonable basis to believe that there was a fair probability that evidence of criminal activity would be found by obtaining the requested information regarding Mathis' facebook account. Specifically, the affidavit set forth that CLD had been trafficked by Mathis, that CLD communicated through facebook with MLF, that Mathis had a facebook account, and that CLD appeared to be looking for Mathis through facebook connections. Further, the affidavit set forth Investigator Martin's professional experience that sex traffickers and the individuals they traffic (as Defendant Mathis and CLD were alleged to be] often communicate through facebook.

Moreover, even if the search warrant lacked probable cause, the Undersigned would nevertheless recommend denying Defendant's request to suppress the evidence obtained as a result of the execution of the August 22, 2017, search warrant because of the application of the good-faith exception to the exclusionary rule as articulated in U.S. v. Leon, 468 U.S. 897, 922 (1984).

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant

later held invalid." <u>Davis v. United States</u>, 564 U.S. 229, 238-39 (2011) (quoting <u>Leon</u>, 468 U.S. at 922). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

<u>United States v. Marion</u>, 238 F.3d 965, 969 (8th Cir. 2001).

Defendant does not argue that any of the four aforementioned circumstances are present with respect to the August 22, 2017, search warrant, nor does the record reflect that any such circumstances existed. Therefore, even assuming solely for the sake of argument that the August 22, 2017, search warrant was not supported by probable cause, the police's reliance upon the warrant was objectively reasonable and, as such, the exclusionary rule would not act to require suppression of any evidence obtained by execution of the August 22, 2017, search warrant.

Accordingly, to the extent that Defendant Mathis seeks to suppress the items seized pursuant to the August 22, 2017, search warrant described above, the Undersigned recommends that Defendant Mathis' Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], be denied.

### iv.  October 19, 2017, Search Warrant (Govt.'s Exh. 4, [Docket No. 62-4])

Although the October 19, 2017, search warrant is mentioned in Defendant Mathis' briefing, he raises no specific challenge to it. (Mem. in Supp., [Docket No. 73], at 9). Rather, Defendant Mathis states that "[t]he result of this search is now moot," as the warrant was intended to uncover Defendant Mathis' location, and he was subsequently arrested in Rock

Island, Illinois. (Id.). Thus, it appears that Defendant Mathis has waived any challenge he originally intended to bring to the October 19, 2017, search warrant.

Accordingly, to the extent that Defendant Mathis seeks or at any time sought to suppress the items seized pursuant to the October 19, 2017, search warrant, the Undersigned recommends that Defendant Mathis' Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], be denied.

### v. April 18, 2018, Search Warrants (Govt.'s Exhs. 5 and 6, [Docket Nos. 62-5 and 62-6])

The final two search warrants Defendant Mathis challenges are addressed together in this Report and Recommendation, as Defendant Mathis addresses them together in his written submissions to the Court, and so does the Government. (See, Mem. in Supp., [Docket NO. 73], 9-10; Mem. in Opp., [Docket No. 79], 10-11).

### 1. Recusal

Before addressing the merits of the parties' arguments on this issue, the Undersigned pauses to resolve Defendant Mathis' objection to the Undersigned reviewing the sufficiency of the probable cause underlying these two warrants. The warrants in question were issued on April 18, 2018, by the Undersigned. (Govt. Exhs. 5 and 6, [Docket Nos. 62-5 and 62-6]). Because the Undersigned was the issuing judge, Defendant Mathis argues that the instant review by the Undersigned at the very least conveys "an appearance of unfairness." (May 7, 2018, Motions Hearing, Digital Record, 10:32:45-10:44; Mem. in Supp., [Docket No. 73], 10).

Defendant Mathis has cited no legal authority that requires the Undersigned to recuse himself from the present Motion. The Eighth Circuit has rejected similar arguments that judicial officers who issue search warrants must recuse themselves from further proceedings regarding

those warrants simply because suppression of evidence obtained thereby "would require the judge's initial decision to be overruled." See, U.S. v. Jones, 801 F.2d 304, 312 (8th Cir. 1986). Similarly, Federal Courts across the United States have consistently held that a judge who issues a search warrant is not necessarily required to recuse him- or herself from later presiding over matters arising in a subsequent criminal case against an individual who was affected by the search warrant. See, e.g., U.S. v. Hanhardt, 134 F. Supp. 2d 972, 976 (N.D. Ill. 2001) (collecting cases holding that a district court's orders entered during pre-indictment investigations do not necessarily warrant that court's later recusal); Smith v. Harrington, No. CV 09-9209 SVW (JCG), 2010 WL 5776046, *4 (C.D. Cal. Aug. 30, 2010) ("[T]he Court is [not] aware of any requirement that a trial judge signing a search warrant recuse himself from later presiding over the case."); U.S. v. Henry, No. 1:08CR83-01, 2008 WL 5110856, *3 (N.D. W. V. Dec. 3, 2008) ("The Sixth Circuit likewise found that judges need not recuse themselves from hearing motions to suppress evidence obtained by wiretap warrants signed by the same judge.").

Defendant Mathis cites no specific facts indicating a personal bias or prejudice on the part of the Undersigned. Rather, he merely asserts the argument already rejected by the Eighth Circuit in Jones – that the Undersigned should not participate in the decision of the review of search warrants he previously signed. (Mem. in Supp., [Docket No. 73], 10). As stated above, this argument fails. In addition, as explained at the May 7, 2018, Motions Hearing, Defendant Mathis is further afforded protection by the procedure set forth in 28 U.S.C. § 636(b)(1), by which he may file objections to this Report and Recommendation and thus obtain de novo determination by the District Court Judge of any matters to which objections are made.

## 2. Analysis

The final two warrants challenged by Defendant Mathis in the present Motion were issued on April 18, 2018, and they authorized the search of two cell phones seized from Defendant Mathis during his March 11, 2018, arrest in Rock Island, Illinois. (Govt. Exhs. 5 and 6, [Docket Nos. 62-5 and 62-6]; see, also, Mem. in Supp., [Docket No. 73], 9). Defendant Mathis argues that the affidavits submitted in support of the applications for these April 18, 2018, search warrants lacked the requisite probable cause to issue the warrants because "[t]he probable cause section is generic for each warrant, hence conclusory." (Mem. in Supp., [Docket No. 73], 9). Defendant Mathis contends that the supporting affidavits contain nothing to show that these particular phones "were used to facilitate criminal activity." (Id. at 10).

A review of the substantively identical affidavits submitted in support of the April 18, 2018, search warrant applications shows otherwise. (See, Govt. Exhs. 5 and 6, [Docket Nos. 62-5 and 62-6]). They initially set forth Agent Heidenreich's identity and his experience working "multiple investigations involving sex trafficking offenses." ([Docket No. 62-5], 8; [Docket No. 62-6], 8). They further relate the facts involving CLD's discovery at Ms. Brown's apartment on July 7, 2017, where Defendant Mathis was also present, and CLD's statements during her subsequent interviews with law enforcement. ([Docket No. 62-5], 9-10; [Docket No. 62-6], 9-10). Specifically, the affidavits relate CLD's statements that Defendant Mathis physically assaulted and sexually trafficked her, and that Defendant Mathis "used multiple cellular telephones to communicate with people, including [CLD], and that he frequently communicated via Facebook Messenger, which he accessed through his cellular telephones." ([Docket No. 62-5], 10; [Docket No. 62-6], 10). The affidavits also set forth statements by MLF that Defendant Mathis had used his cell phone to take pictures of her and CLD wearing only undergarments,

21

pictures that MLF believed were taken to enable Defendant Mathis to "'sell'" MLF and CLD for sex. ([Docket No. 62-5], 13; [Docket No. 62-6], 13).

The affidavits submitted in support of the April 18, 2018, search warrant applications additionally stated that law enforcement officers later identified Defendant Mathis' Facebook account and, pursuant to a search warrant for that account, discovered communication between Defendant Mathis' account and another Facebook user that "indicated that [Defendant] Mathis was attempting to sell females for sex." ([Docket No. 62-5], 10-11; [Docket No. 62-6], 10-11). In those communications, Defendant Mathis sent images of partially dressed females, later identified as CLD and MLF, and articulated prices for sexual services. ([Docket No. 62-5], 11; [Docket No. 62-6], 11). This individual later confirmed to law enforcement that Defendant Mathis "had solicited him, via Facebook Messenger, to purchase two females for sex," and he showed the messages, which were still on his cell phone, to law enforcement. ([Docket No. 62-5], 12; [Docket No. 62-6], 12).

The supporting affidavits further stated how Defendant Koech was identified by law enforcement as likely being an individual to whom CLD had been trafficked, and that Defendant Koech had told law enforcement that he communicated with Defendant Mathis via his cell phone. ([Docket No. 62-5], 11; [Docket No. 62-6], 11). Defendant Koech's cell phone was seized and a forensic review thereof revealed a text message that indicated that Defendant Koech was attempting to exchange money for sex; that text message exchange was quoted in the affidavits submitted in support of the April 18, 2018, search warrant applications. ([Docket No. 62-5], 11-12; [Docket No. 62-6], 11-12). The phone number with which Defendant Koech exchanged these text messages was identical to the phone number Defendant Mathis identified as his own on March 21, 2017. ([Docket No. 62-5], 12; [Docket No. 62-6], 12). In addition, CLD

and the individual referenced above who stated Mathis had attempted to sell him females for sex via Facebook Messenger both identified the phone number as belonging to Defendant Mathis. ([Docket No. 62-5], 12; [Docket No. 62-6], 12).

The supporting affidavits set forth law enforcement's belief that Defendant Mathis left Duluth shortly after CLD was removed from Ms. Brown's apartment, and that he absconded from probation supervision stemming from unrelated Minnesota State criminal convictions, leading to the issuance of a warrant for his arrest. ([Docket No. 62-5], 13; [Docket No. 62-2], 13). The affidavits quoted messages sent from Defendant Mathis' Facebook account that indicated he was actively evading law enforcement. ([Docket No. 62-5], 14; [Docket No. 62-6], 14). However, on March 11, 2018, Defendant Mathis was arrested in Rock Island, Illinois, and two cell phones were seized during his arrest. ([Docket No. 62-5], 14; [Docket No. 62-6], 14).

In the affidavits submitted in support of the April 18, 2018, search warrant applications, Agent Heidenreich related the following knowledge, gleaned from his training and experience:

> [C]ellular telephones are used to communicate with victims, co-conspirators, and potential "johns" or commercial sex purchasers through text messages, Facebook Messenger, and various other apps. As such, the cellular telephone[s] would include contact information, photographs, text messages, and other communication between the trafficker and victims and commercial sex purchasers. I also know that cellular telephones are used to take photographs and/or videos to advertise victims for commercial sex acts, including in minimal to no clothing, some of which may constitute child pornography. Moreover, cellular telephones are used to record locations of travel and communication, including evidence that may be indicative of obstruction or the attempt to obstruct or in any way interfere with or prevent the enforcement of federal sex trafficking laws or the obstruction of court orders more generally. It is likely that such information would remain on a cellular telephone or indicia of such evidence would be available through forensic review of such a device.

([Docket No. 62-5], 15; [Docket No. 62-6], 15).

After setting forth the definitions of technical terms used in the warrant applications, as well as his knowledge that information may be retained upon cell phones for long periods of

time, Agent Heidenreich concluded with his belief, "[b]ased on the foregoing," that there was probable cause to believe that Defendant Mathis used cell phones to "communicate with [CLD]; take a digital image(s) of [CLD] and [MLF]; and communicate, via text message and Facebook Messenger, to others in an attempt to facilitate" criminal sex trafficking of minors. ([Docket No. 62-5], 22; [Docket No. 62-6], 22).

Defendant Mathis' argument that there is "nothing in the supporting affidavit that indicates these particular phones were used to facilitate criminal activity" is belied by the information within the four corners of the affidavits, as set forth above. The cell phones were seized from Defendant Mathis, and multiple individuals made statements regarding Defendant Mathis' use of cell phones and electronic communication to facilitate the criminal sex trafficking of minors through taking photographs, sending text messages, and utilizing Facebook Messenger. In fact, text messages from a phone number Defendant Mathis and multiple other individuals all identified as being Defendant Mathis' phone number, as well as Facebook Messenger communications from Defendant Mathis' Facebook account were recovered by law enforcement; these communications likewise revealed that Defendant Mathis was, at the very least, attempting to traffic CLD. Moreover, the affidavits set forth that in addition to direct evidence such as communications or pictures of CLD and MLF, information regarding "how the [cell phone] was used, the purpose of its use, who used it, and when" could potentially be retrieved from the cell phones. ([Docket No. 62-5], 20; [Docket No. 62-6], 20).

Under the totality of the circumstances, the affidavits submitted in support of the applications for the April 18, 2018, search warrants of the cell phones seized from Defendant Mathis during his Rock Island, Illinois, arrest were sufficient to provide a reasonable basis to

believe that there was a fair probability that evidence of criminal activity would be found in those cell phones.

Defendant Mathis also argues briefly that the April 18, 2018, warrants are stale because "[t]he alleged victim was found on July 7, 2017, with these two searches authorized over nine months later. . . . The alleged victim hadn't been 'trafficked' for nearly a year." (Mem. in Supp., [Docket No. 73], 10). The Government disagrees, arguing that the warrants were timely. (Mem. in Opp., [Docket No. 79], 12-13).

> "There is no bright-line test for determining when information in a warrant is stale." "A warrant becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search."

United States v. Ortiz-Cervantes, 868 F.3d 695, 700 (8th Cir. 2017). When considering if a warrant is stale, the Court must "'consider the nature of the crime being investigated and the property to be searched.'" United States v. Davis, 867 F.3d 1021, 1028 (8th Cir. 2017). Thus, contrary to Defendant Mathis' argument, the date of the crime being investigated is not the only relevant factor.

Under the circumstances of the present case, the information supporting the April 18, 2018, search warrants were not stale. The lapse of time between the trafficking of CLD and the issuance of the April 18, 2018, search warrants was less than a year. The Eighth Circuit has upheld search warrants with lapses of time much longer than the delay in the present case. See, United States v. Lemon, 590 F.3d 612, 614 (8th Cir. 2010) (upholding a search warrant issued 18 months after discovery of information related to possession of child pornography). Moreover, the April 18, 2018, search warrants were for cell phones that were not seized until March 11, 2018. And, as already set forth above, the affidavits in support of the April 18, 2018, search warrant applications included information that established probable cause to believe Defendant Mathis

used cell phones to facilitate sex trafficking, and the affidavits also included Agent Heidenreich's experience "that electronic devices can store information for long periods of time." ([Docket No. 62-5], 19; [Docket No. 62-6], 19). Thus, there was sufficient evidence to show that probable cause existed at the time of the issuance of the April 18, 2018, search warrants. The April 18, 2018, search warrants were not fatally stale.

### C. Conclusion

For all of the reasons set forth above, the Undersigned recommends that Defendant Mathis' Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], be **denied**.

## III.    DEFENDANT'S MOTION TO SEVER, [DOCKET NO. 55]

### A. Standards of Review

Federal Rule of Criminal Procedure 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Federal Rule of Criminal Procedure 14(a) provides:  "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

> "There is a preference in the federal system for joint trials of defendants who are indicted together." "This preference is 'especially compelling when the defendants are charged as coconspirators.'" "It is well settled in this circuit that a motion for relief from an allegedly prejudicial joinder of charges or defendants raises a question that is addressed to the judicial discretion of the trial court . . . ."

United States v. Benton, 890 F.3d 697, 713-14 (8th Cir. 2018).

> "Accordingly, if joinder is proper under Rule 8, a defendant seeking severance 'has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996). "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro v. United States, 506 U.S. 534, 540 (1993) (citations omitted). . . .
>
> A defendant seeking to sever his trial must therefore show that a joint trial would case "real prejudice." United States v. Mickelson, 378 F.3d 810, 817-18 (8th Cir. 2004). "Real prejudice" exists when "(a) [a defendant's] defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants.

United States v. McConnell, No. 13-cr-273 (SRN/FLN), 2017 WL 111304, *3 (D. Minn. Jan. 11, 2017).

### B. Analysis

Defendant Mathis contends that his trial must be severed from the trial of his co-defendant, Defendant Koech, under Bruton v. United States, 391 U.S. 123 (1968), because, "[i]n order to prove its case, the Government needs to show the video statements of Mr. Koech, where he indicates that Mr. Mathis trafficked the alleged victim." (Mem. in Supp., [Docket No. 73], 13; see, also, Motion, [Docket No. 55], 1-2).

> In Bruton, the Supreme Court held that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.

U.S. v. Ali, 799 F.3d 1008, 1024-25 (8th Cir. 2015) (quoting Richardson v. Marsh, 481 U.S. 200, 201-02 (1987)). Defendant Mathis argues that statements by Defendant Koech which the Government has already disclosed to Defendant Mathis include Defendant Koech's assertion that Defendant Mathis introduced him to the minor whom Defendant Mathis allegedly trafficked. (Mem. in Supp., [Docket No. 73], 13). Thus, Defendant Mathis contends, allowing his trial to

remain joined with the trial of Defendant Koech to remain joined will result in a violation of Bruton. (Id. at 13-14).

The Government disagrees, arguing that Defendant Mathis' motion to sever is at this point premature and based upon mere speculation. (Mem. in Opp., [Docket No. 79], 19-20). For example, the Government acknowledges Defendant Mathis' argument that allowing the Government to introduce statements by Defendant Koech that implicate Defendant Mathis in the crimes charged if Defendant Koech opts not to testify at a joint criminal trial of both Defendants could result in a violation of Bruton. (Id. at 19; See, also, Mem. in Supp., [Docket No. 73], 14). First, the Government asserts that it has not yet fully determined which evidence and statements it will introduce at trial, and it notes that Defendant Koech's statements are not the sole evidence implicating Defendant Mathis in the crimes charged. (Mem. in Opp., [Docket No. 79], 20). Thus, the Government may or may not attempt to introduce the statements in which Defendant Koech implicates Defendant Mathis, even in redacted form. In any event, the Government contends that if such an issue arises, the trial court may at that time consider whether redactions and proposed instructions are sufficient to avoid the Bruton violation. (Mem. in Opp., [Docket No. 79], 19).

The Undersigned agrees. "'Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances.'" U.S. v. Rios-Quintero, No. 16-cv-161(1) (MJD/LIB), 2016 WL 6134545, *13 (D. Minn. Sept. 9, 2016) (quoting U.S. v. Billups, 442 F. Supp. 2d 697, 706 (D. Minn. 2006)). Upon the current record, which contains no more than mere speculation by Defendant Mathis as to the evidence he anticipates the Government will attempt to introduce at trial, it is not apparent that the concerns addressed in Bruton will in fact manifest in this case. If such circumstances change in the future, Defendant Mathis is free to renew his motion to sever at that time. See, Billups, 442 F. Supp. 2d at 706.

28

Accordingly, the Undersigned recommends that Defendant Mathis' Motion to Sever, [Docket No. 55], be **DENIED without prejudice**.

## IV.    DEFENDANT'S MOTION TO STRIKE SURPLUSAGE, [DOCKET NO. 56]

### A.  Standards of Review

Rule 7(d) of the Federal Rules of Criminal Procedure provides:  "Upon the defendant's motion, the court may strike surplusage from the indictment or information." "'A motion to strike surplusage from an indictment is a matter within the court's discretion' and should only be granted when it is clear that the alleged surplusage is irrelevant or prejudicial." United States v. Griffin, No. 15-cr-160 (DWF/FLN), 2016 WL 912180, *4 (D. Minn. March 7, 2016) (quoting United States v. DeRosier, 501 F.3d 888, 897 (8th Cir. 2007)).

### B.  Analysis

In the Indictment, Defendant Mathis is identified as "Andre Mathis, Jr., a/k/a Isaac Brown." [Docket No. 19]. Defendant Mathis now moves the Court for an Order striking his purported alias from the Indictment. [Docket No. 56]. He contends that his alleged use of the alias "Isaac Brown" is irrelevant to the charges now brought against him, as the minor victim does not know him by that alias. (Mem. in Supp., [Docket No. 73], 12-13).

In its initial written response to the Motion to Strike Surplusage, the Government noted that Defendant Mathis had used the alias "Isaac Brown" in charges brought against him in Cook County in 2007. (Govt. Brief, [Docket No. 62], 22). Moreover, at the time Defendant Mathis was indicted on the present charges, "his whereabouts were unknown and the grand jury indicted him under his true name and alias." (Id.). In the briefing it completed and submitted after the May 7, 2018, Motions Hearing in this case, the Government further argues that since the May 7, 2018, Motions Hearing (and subsequent to Defendant Mathis submitting his post-Motion Hearing

briefing), the Government searched a cell phone it alleges belongs to Defendant Mathis and discovered that the name "Isaac Brown" is listed in the "User Account" portion of the phone. (Mem. in Opp., [Docket No. 79], 16-17). Moreover, the Government alleges that a message sent from that phone stated, "Dre here," and the user name Isaac Brown also shows an associated email address which is similar to a screen name associated with Defendant Mathis. (Id. at 17).

In light of the assertions now made by the Government with respect to the subsequently discovered evidence related to the name "Isaac Brown," it is not clear that the alleged surplusage in the Indictment in the present case is irrelevant. Moreover, to the extent that Defendant Mathis has expressed concern over the prejudice that the inclusion of this alias could cause in the eyes of the jury, (see, Motion, [Docket No. 56], 1), the Government correctly notes that such a concern may be fully and appropriately addressed at a time closer to trial. (See, Mem. in Opp., [Docket No. 79], 16). If Defendant continues to believe that the inclusion of an alias in the indictment is irrelevant and/or that it would improperly prejudice a jury, the Court may consider a later pretrial motion in limine by Defendant Mathis related to the issue of how the Court should present the information in the indictment to the jury. See, Griffin, 2016 WL 912180, *4 (expressing a willingness to hear such pretrial motions).

Accordingly, the Undersigned recommends that Defendant Mathis' Motion to Strike Surplusage, [Docket No. 56], be **DENIED without prejudice**.

V.    **DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS SEARCH AND SEIZURE, [DOCKET NO. 57]**

A.  **Analysis**

i.  **The "Rock Island stop and arrest"**

In his Supplemental Motion to Suppress Search and Seizure, [Docket No. 57], Defendant Mathis stated: "[W]e challenge Mr. Mathis' Rock Island stop and arrest in Rock Island, as without sufficient basis. Without that stop, no phones would have ever been seized." ([Docket No. 57], 2). At the May 7, 2018, Motions Hearing, counsel for Defendant Mathis reasserted the request that the "arrest and stop in Rock Island, Illinois, be suppressed." (May 7, 2018, Digital Record, 10:36-37). At the May 7, 2018, Motions Hearing, the Government did not offer any testimony or evidence regarding the stop and subsequent arrest in Rock Island, Illinois, instead arguing that there had been no meet-and-confer regarding Defendant Mathis' desire to suppress that stop and arrest. The Government further asserted that the 2-sentence mention in Defendant Mathis' Supplemental Motion to Suppress Search and Seizure was too generic and did not sufficiently articulate an alleged constitutional violation to allow the Government to prepare and present testimony or evidence in support of the stop and arrest at the Motions Hearing. (Id. at 10:36-10:39).

In the supplemental, post-Hearing briefing submitted to the Court, Defendant Mathis again challenges his stop in Rock Island, Illinois. (Mem. in Supp., [Docket No. 73], 12). He concedes that there was no pre-Motions Hearing meet-and-confer on the issue, but posits that the Government's position would not have changed even if a meet-and-confer had occurred. (Id. at 11-12). Defendant Mathis then cites legal authority for the proposition that "[o]nce the motion [challenging a stop and/or arrest] is filed, the Government is then obligated to present evidence

31

that the questioned search and seizure was valid." (<u>Id.</u> at 12). Explaining that this is a serious case with potentially very serious consequences, Defendant Mathis ends his argument without articulating any specific basis to challenge the events that occurred in Rock Island, Illinois, in March 2018. (<u>Id.</u>).

In response, the Government argues that even if Defendant Mathis' stop and subsequent arrest in Rock Island, Illinois, were unlawful, the cell phones, which were seized during that arrest, should not be suppressed. (Mem. in Opp., [Docket No. 79], 14-15). In support, the Government cites <u>Utah v. Strieff</u>, 136 S. Ct. 2056 (2016). (<u>Id.</u> at 15).

In <u>Strieff</u>, the United States Supreme Court stated:

> To enforce the Fourth Amendment's prohibition against "unreasonable searches and seizures," this Court has at times required courts to exclude evidence obtained by unconstitutional police conduct. But the Court has also held that, even when there is a Fourth Amendment violation, this exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits. In some cases, for example, the link between the unconstitutional conduct and the discovery of the evidence is too attenuated to justify suppression. The question in this case is whether this attenuation doctrine applies when an officer makes an unconstitutional investigatory stop; learns during that stop that the suspect is subject to a valid arrest warrant; and proceeds to arrest the suspect and seize incriminating evidence during a search incident to arrest. We hold that the evidence the officer seized as part of the search incident to arrest is admissible because the officer's discovery of the arrest warrant attenuated the connection between the unlawful stop and the evidence seized incident to arrest.

136 S. Ct. at 2059.

As the Government argues, the United States Supreme Court's holding in <u>Strieff</u> is controlling of this issue as it stands in the Motion presently before the Court. Even assuming solely for the sake of argument that the stop of Defendant Mathis in Rock Island, Illinois, was unconstitutional, the evidence in the record before the Court demonstrates that Defendant Mathis "was arrested at 3:17 a.m. . . . on the FBI and St. Louis County [Minnesota] warrants." (Govt. Exh. 5, [Docket No. 62-5], 14). Defendant Mathis does not argue otherwise, and in his post-

Motion Hearing briefing, he appears to limit his challenge solely to the "stop." (See, Mem. in Opp., [Docket NO. 73], 11 (quoting Docket No. 57 as stating "'[w]ithout the stop, no phones would have ever been seized'" and omitting the reference in the quoted language to the arrest)). Therefore, the cell phones that were seized pursuant to Defendant Mathis' arrest on the outstanding arrest warrants need not be suppressed, even if, as he argues, the initial investigatory stop in Rock Island, Illinois, was constitutionally infirm.

Accordingly, to the extent that it seeks to suppress the cell phones seized during the arrest of Defendant Mathis on the basis of the two outstanding arrest warrants in Rock Island, Illinois, the Undersigned recommends that Defendant Mathis' Supplemental Motion to Suppress Search and Seizure, [Docket No. 57], be **denied**.

### ii. The July 7, 2017, "Seizure" of Defendant Mathis

Defendant Mathis challenges what he alternatively refers to as his "seizure" and his "arrest" on July 7, 2017. (Motion, [Docket No. 67], 2; Mem. in Supp., [Docket No. 73], 1-5). He is referring to the events of July 7 and 8, 2017, at Ms. Brown's apartment. He argues that he was "detained" in Ms. Brown's apartment for 2 hours, simply by virtue of having happened to be there when the police arrived to check Ms. Brown's GPS device, after which detention law enforcement executed a warrant for his DNA. (Id. at 1-2). Defendant Mathis concedes that he was allowed to leave after his DNA samples were taken. (Id. at 3). However, he asserts that because he was "in custody" at the time prior to the execution of the warrant for his DNA, any statements he made during that time must be suppressed because he was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). (Mem. in Supp., [Docket No. 73], 3-5).

As the Government notes, the events at Ms. Brown's apartment which are now in question occurred as two separate events. First, there was the initial entry into Ms. Brown's

apartment to check her GPS unit, during which time CLD was discovered and ultimately removed from the apartment. Second, there was the subsequent return of law enforcement to Ms. Brown's apartment with a warrant to search the apartment and to take a penile and buccal swab from Defendant Mathis.

With respect to the first encounter, Defendant Mathis contends that he was illegally "confined" in Ms. Brown's apartment simply because he happened to be there when police arrived. (Mem. in Supp., [Docket No. 73], 1-2). The audio/video footage of the initial, 40-minute encounter that led to the removal of CLD from Ms. Brown's apartment shows reveals otherwise.

When Duluth police and Ms. Brown's probation officer initiated contact with Ms. Brown at her apartment, they informed her that there was "a concern about [her] ankle bracelet," and Ms. Brown let them into her apartment and into the living room/dining room area. (Govt. Exh. 14, C_D-file 2(2).mp4, 00:00-2:21). When one of the officers asked if anyone else was there, Defendant Mathis walked out of from a short hallway that led to the apartment's bedrooms and said, "No." (Id. at 2:30-47). The officer explained to Defendant Mathis that they were there to check Ms. Brown's ankle bracelet. (Id. at 2:47-3:06). Approximately 30 seconds later, CLD was discovered by another officer in the closet in one of the bedrooms. (Id. at 3:30-34). From that point until police left Ms. Brown's apartment, the officers were engaged in an attempt to determine CLD's identity, her age, why she was in Ms. Brown's apartment, and why Defendant Mathis had informed them that no one else was there. The audio/video recording does not reflect that at any time police restrained Defendant Mathis from leaving, and in fact the audio/video recording shows that Defendant Mathis freely moved about Ms. Brown's apartment unrestrained, and even helped CLD gather her belongings prior to CLD leaving with police. (Id. at 4:00-

34

39:18). Thus, the evidence now before the Court does not reflect that Defendant Mathis was "seized" during the initial encounter with police at Ms. Brown's apartment.

In any case, even assuming solely for the sake of argument that Defendant Mathis was "seized" during the initial encounter, such a seizure would be reasonable under the Fourth Amendment. Shortly after CLD was discovered hiding in a closet in Ms. Brown's apartment, the intrusion changed tenor, becoming an investigatory stop into whether CLD was a minor, as police suspected, and to her true identity, as she gave police a false name when initially asked. The discovery of an apparent minor, who gave a false name and was hiding in a closet, after Defendant Mathis stated that no one was else in the apartment, would justify a reasonable, articulable suspicion that criminal activity was afoot and involved the two adults present in the apartment, Ms. Brown and Defendant Mathis. Thus, a brief, investigative detention was justified. See, U.S. v. Horton, 611 F.3d 936, 940 (8th Cir. 2010) (citing Terry v. Ohio, 392 U.S. 1, 16-19, 22 (1968)). Moreover, "'an officer may temporarily detain an individual during a Terry stop . . . to maintain the status quo while obtaining more information.'" U.S. v. Bearden, 780 F.3d 887, 894 (8th Cir. 2015) (citation omitted).

Similarly, even assuming that Defendant was detained during the second encounter at Ms. Brown's apartment, while officers executed the search warrant of Ms. Brown's apartment and for Defendant Mathis' DNA, such detention was reasonable because it was pursuant to a lawful search warrant. In Michigan v. Summers, 452 U.S. 692, 705 (1981), the United States Supreme Court "permitted officers executing a search warrant 'to detain the occupants of the premises while a proper search is conducted.'" See, Bailey v. U.S., 568 U.S. 186 (2013) (quoting Summers). This is undisputably the basis for Defendant Mathis' detention during the second

35

police presence at Ms. Brown's apartment on the day in question, and, under <u>Summers</u>, it does not offend the Fourth Amendment.

However, reasonableness of a seizure under the Fourth Amendment does not resolve Defendant Mathis' argument that he was unlawfully held in custody and interrogated during those periods without first being advised of his <u>Miranda</u> rights. (<u>See</u>, Mem. in Supp., [Docket No. 73], 2-5). Rather, an "analysis[] under <u>Miranda</u>[] invokes different concerns than those relevant for purposes of a Fourth Amendment analysis, and instead asks 'whether the defendant was restrained as though he were under formal arrest'" and whether he was interrogated by law enforcement during that period of restraint. <u>See</u>, <u>U.S. v. May</u>, 440 F. Supp. 2d 1016, 1028-29).

"To determine whether a suspect was in custody, we ask 'whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave.'" <u>U.S. v. Laurita</u>, 821 F.3d 1020, 1024 (8th Cir. 2016). If an interview is not custodial, law enforcement is not required to advise an individual of his <u>Miranda</u> rights and statements made during a non-custodial encounter need not be suppressed for the lack of <u>Miranda</u> warnings. <u>Giboney</u>, 863 F.3d at 1029.

> "The ultimate question in determining whether a person is in 'custody' for purposes of <u>Miranda</u> is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." This determination is not based on the interrogator's perspective; 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'
>
> Six factors inform our analysis, although the factors are not exhaustive and need not be applied "ritualistically" in every case. The first three factors, which if present tend to show that [an individual] was not in custody, are:
>
>> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; [and] (3) whether the suspect initiated contact with

authorities or voluntarily acquiesced to official requests to respond to questions.

The remaining factors, if present, favor a finding that [an individual] was in custody during the interrogation. Those factors are: "(4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning."

Id. (citations omitted).

A review of these factors in the present case, with respect to Defendant Mathis' interactions with law enforcement which are now at issue reveals that Defendant Mathis was not in custody, and therefore, officers were not required to advise him of his Miranda rights at any time.

The audio/video recordings in the record which are currently before the Court show that Defendant Mathis was not restricted in his movements within Ms. Brown's apartment. (Govt. Exh. 14, C_D-file 2(2).mp4; AXON_Body_2_Video_2017-07-08).[3] They reflect no "strong arm tactics or deceptive stratagems" by police. As already stated above, they show that Defendant Mathis was not restricted in his movements inside Ms. Brown's apartment and, further, they show that he was not handcuffed. They do not show Defendant Mathis attempting to leave the apartment and being prevented from doing so.

---

[3] The Undersigned notes that despite the Government's representations and citations in its post-Motions Hearing written submissions, (see, Mem. in Supp., [Docket No. 79], 2-3), the disc comprising Govt. Exh. 14 does not contain an audio/video recording of the second interaction at Ms. Brown's apartment that is now at issue. The Government's briefing indicates that this full, more-than-46-minute interaction is recorded and provided as "Sex_Trafficking.mp4." (Id. at 2-3). However, the recording on the Government's Exhibit 14 titled "Sex_Trafficking.mp4" as submitted to the Court is only 7 minutes and 24 seconds long and, although it reflects interactions between Ms. Brown and law enforcement in the hallway outside her apartment, it does not reflect the events for which it is cited in the Government's briefing. (See, Govt. Exh. 14, Sex_Trafficking.mp4"). The only audio/video recording submitted to the Court of the second encounter at Ms. Brown's apartment is Govt. Exh. 14, AXON_Body_2_Video_2017-07-08, which is 5 minutes and 21 of the footage at the very beginning of the officers' return to Ms. Brown's apartment to execute the search warrant. Accordingly, the Undersigned cannot adequately review the Government's full argument that there was no interrogation of Defendant during the second encounter at Ms. Brown's apartment. However, since the record currently before the Court is sufficient to resolve the present Motions, the Government's failure to submit this recording does not alter the Undersigned's analysis.

Moreover, Defendant Mathis does not articulate any factors that would have convinced a reasonable person in his position that he was unable to terminate the interactions with police. He does not assert that he was told he could not leave. He does not assert that police in any way threatened him or otherwise coerced him into staying in the apartment. Rather, Defendant Mathis merely makes the conclusory statement that he "had more than reasonable belief that he had to stay." (Mem. in Supp., [Docket No. 73], 4). He also disagrees with the Government's anticipated argument that the atmosphere was not police-dominated by pointing out that there were four police officers present. However, the number of police officers present does not, by itself, render an encounter custodial for Miranda purposes, especially in light of the fact that during the first encounter, there were three civilians present, so the ratio of police officers-to-civilians was not overwhelming.

Considering the totality of the circumstances as presented and argued to the Court, a reasonable man in Defendant Mathis' position would have believed that upon completion of the execution of the lawful search warrant he was at liberty to terminate his encounters with police at Ms. Brown's apartment by leaving the apartment. Thus, the encounter was not custodial, and police were not required to advise him of his Miranda rights. See, Giboney, 863 F.3d at 1029 (holding that statements made during a non-custodial encounter need not be suppressed for the lack of Miranda warnings).

Finally, even assuming solely for the sake of argument that any of Defendant Mathis' arguments showed unconstitutional action of any kind on the part of law enforcement, the Undersigned would nevertheless recommend denial of the present Motion because Defendant Mathis does not appear to seek any obtainable relief.

At the May 7, 2018, Motions Hearing, when asked what, if any, evidence was taken as a result of the alleged "seizure of his body" that occurred on July 7, 2017, and which he was challenging in his Supplemental Motion to Suppress Search and Seizure, [Docket No. 57], Defendant Mathis identified only the cell phones which were taken from Ms. Brown's apartment that same day, pursuant to a proper warrant. (May 7, 2018, Motions Hearing, Digital Record, 10:34-37). As already explained above, Defendant Mathis lacks standing to challenge the search warrant for Ms. Brown's home, as he does not even assert that he was a resident or had any reasonable expectation of privacy therein.

To the extent that Defendant Mathis seeks suppression of the results of the buccal and penile swabs taken at the conclusion of the second encounter, those samples were also taken pursuant to a proper search warrant, which, for the reasons already set forth above, was valid and supported by probable cause.

Finally, to the extent that Defendant Mathis is attempting to suppress of statements he made during the two encounters at Ms. Brown's apartment, he has failed to identify with specificity the statements he wishes suppressed, so he has not met his burden of production. See, United Stated v. Quiroz, 57 F. Supp. 805, 822–23 (D. Minn. 1999) report and recommendation adopted by 57 F. Supp. 2d 805, 811 (D. Minn. 1999) ("The Motion is boilerplate in form. It merely requests suppression of all statements made by Defendant. The Motion does not specify the statements Defendant seeks to have suppressed, nor the specific legal and factual grounds for the objections. As a result, no hearing was required, and the Motion should be denied based upon the pleadings."); United States v. Peterson, No. 15-cr-165 (35) (JRT/LIB), 2016 WL 1626848, at *3 (D. Minn. Apr. 25, 2016) ("In a motion to suppress evidence, a moving party must specify the

statement or evidence which is sought to be suppressed, and articulate with clarity the factual and legal basis upon which each is sought to be suppressed.") (internal citations omitted).

### B. Conclusion

Accordingly, for all of the reasons stated above, the Undersigned recommends that Defendant Mathis' Supplemental Motion to Suppress Search and Seizure, [Docket No. 57], be **denied**.

## VI.    DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, [DOCKET NO. 58]

In his Motion to Suppress Statements, [Docket No. 58], Defendant Mathis again seeks suppression of statements he made while at Ms. Brown's apartment on July 7, 2017. For all of the reasons stated above with respect to Defendant Mathis' Supplemental Motion to Suppress Search and Seizure, [Docket No. 57], suppression of those statements is not warranted. In addition, although Defendant Mathis identifies with slightly more specificity in this Motion the statements he wishes suppressed, that specificity does not save his argument. He asserts: "It was during this custodial status that Mr. Mathis was asked pointed questions, inter alia, as to the presence of additional individuals inside the apartment without a required Miranda warning." (Motion, [Docket No. 58], 1-2). At the time Defendant Mathis was asked whether anyone else was in the apartment, police had only been in Ms. Brown's apartment for approximately 2 minutes and 30 seconds and the focus of the encounter was on Ms. Brown's GPS monitor. Defendant Mathis clearly was not in custody, nor was the question regarding the presence of anyone else an "interrogation." (See, Govt. Exh. 14, C_D-file 2(2).mp4, 2:30-47); see, also, Jones, 842 F.3d at 1082 ("Interrogation, for Miranda purposes, means 'express questioning' and 'words or conduct that officers should know [are] "reasonably likely to elicit an incriminating response from the suspect."'"). Thus, Miranda warnings were not required.

Accordingly, for all of the reasons stated above, the Undersigned recommends that Defendant Mathis' Motion to Suppress Statements, [Docket No. 58], be **denied**.

## VII.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion Suppress Evidence Obtained as a Result of Searches and Seizures, [Docket No. 43], be **DENIED**;

2. Defendant's Motion to Sever, [Docket No. 55], be **DENIED without prejudice**;

3. Defendant's Motion to Strike Surplusage, [Docket No. 56]; be **DENIED**;

4. Defendant's Supplemental Motion to Suppress Search and Seizure, [Docket No. 57], be **DENIED**; AND

5. Defendant's Motion to Suppress Statements, [Docket No. 58], be **DENIED**.

Dated: July 17, 2018

s/Leo I. Brisbois
The Honorable Leo I. Brisbois
United States Magistrate Judge

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and

Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.